Filed 10/23/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MIGUEL A. LEYTE-VIDAL, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> TERRY S. SEMEL, et al., <br><br> Defendants and Respondents. | H037762 <br> (Santa Clara County <br> Super. Ct. No. 1-09-CV-147707) |

In this appeal plaintiff Miguel Leyte-Vidal challenges an order sustaining a demurrer without leave to amend in his shareholder derivative action against officers and directors of Yahoo! Inc., a publicly traded company incorporated in Delaware and headquartered in Sunnyvale. Plaintiff contends that he adequately pleaded facts excusing the pre-suit requirement of a demand on the board of directors to pursue litigation on the corporation's behalf. We agree with the superior court, however, that plaintiff failed to allege demand futility with the particularity required under Delaware law. Accordingly, we will affirm the judgment dismissing the action.

*Procedural Background*

Plaintiff initiated this action on July 17, 2009, asserting five causes of action against 15 individual defendants associated with Yahoo!.[1] One day earlier plaintiff had

_____

[1] The named "Individual Defendants" were Terry S. Semel, Susan L. Decker. Arthur H. Kern, Jerry Yang, David Filo, Eric Hippeau, Edward R. Kozel, Robert A. Kotick, Roy J.

dismissed a similar lawsuit he had maintained in federal district court.[2] In his original complaint in superior court he alleged insider selling, in violation of Corporations Code section 25402; breach of fiduciary duty for improper financial reporting, insider selling, and misappropriation of material nonpublic information; abuse of control, gross mismanagement and waste of corporate assets; and unjust enrichment. These claims were based on losses caused by false statements to the public that did not reflect Yahoo!'s true financial picture, the company's failure to control "click fraud" affecting Internet advertisers,[3] and the delay in implementing "Project Panama," a technology platform that was intended to help Yahoo! compete with Google. In addition, several of the "Individual Defendants" were accused of illegal insider trading, having sold stock while in possession of "undisclosed material adverse information."

Three amendments followed, in the wake of successive orders sustaining each of defendants' demurrers with leave to amend. On each occasion the superior court ruled

Bostock, Gary L. Wilson, Ronald W. Burkle, Vyomesh Joshi, Daniel L. Rosensweig, Farzad Nazem, and Maggie Wilderotter. All of these "Individual Defendants" were also referred to as "Director Defendants" except for Decker, Rosensweig, and Nazem. Those three, along with Semel and Filo, were denominated "Officer Defendants."

[2] Plaintiff's federal action originated as a derivative lawsuit brought in June 2007 by Jill Watkins, naming 11 of the same defendants. The derivative lawsuit echoed many of the allegations of a class action brought in May 2007 by Ellen Rosenthal Brodsky and others, asserting violations of federal securities laws by Semel, Yahoo!'s CEO, and Decker, its CFO. Rosensweig and Nazem were added later. The federal district court dismissed the class action without leave to amend on June 18, 2009 for failure to state the requisite particularity in its claims after repeated amendments. (*Brodsky v. Yahoo! Inc.* (N.D. Cal. 2009) 630 F.Supp.2d 1104.)

[3] As described in the operative complaint, "[c]lick fraud" occurs when either automated systems or individuals repeatedly click on an advertisement solely for the purpose of creating revenue for the site on which the ad appears. "[T]he reason click fraud is particularly important is [that] Yahoo! charges advertisers on a scale determined by the amount [*sic*] of clicks Yahoo! creates for the advertisement through placement of the ads. Thus, protecting and policing against false clicks is a critical concern for advertisers."

2

that plaintiff had failed to allege facts specifically directed at demand futility with respect to at least half of the directors plaintiff claimed to be interested or not independent. Consequently, plaintiff lacked standing to bring the action as a derivative lawsuit. Finally, in its September 20, 2011 order, the court again sustained defendants' demurrer but determined that plaintiff's "repeated failure to allege sufficient facts to establish his standing" compelled it to conclude that there was "no reasonable possibility" that this defect could be cured by further amendment. From the ensuing judgment on December 9, 2011, plaintiff filed this timely appeal.

*Discussion*

*1. Standard of Review*

A demurrer is properly sustained when the complaint "does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10, subd. (e).) As we noted in *Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787, " 'It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading.' [Citation.] Thus, . . . 'the facts alleged in the pleading are deemed to be true, however improbable they may be.' [Citations.]" On appeal from a dismissal following the sustaining of a demurrer, this court examines the complaint de novo to determine whether it alleges facts sufficient to constitute a cause of action. Like the trial court, we assume the truth of all properly pleaded factual allegations. "Whether the plaintiff will be able to prove these allegations is not relevant; our focus is on the *legal* sufficiency of the complaint." (*Los Altos Golf and Country Club v. County of Santa Clara* (2008) 165 Cal.App.4th 198, 203; see also *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 243-244.) "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We do not, however, assume the truth of "mere contentions or assertions contradicted by judicially noticeable facts." (*Evans v.*

3

*City of Berkeley* (2006) 38 Cal.4th 1, 20; see also *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1040 ["when the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former"].)

2. *Standing to Assert a Shareholder Derivative Action*

The parties agree that Delaware law controls the outcome of this case—and in particular, the adequacy of plaintiff's pleading. "A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation. [Citations.] . . . The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation. [Citation.] Consequently, such decisions are part of the responsibility of the board of directors." (*Spiegel v. Buntrock* (Del. 1990) 571 A.2d 767, 772-773.)

"The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it. The nature of the action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it." (*Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 811 (*Aronson*), overruled on another point in *Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 253-254.)

A derivative action, however, is in essence "a challenge to a board of directors' managerial power" (*Spiegel v. Buntrock*, *supra*, 571 A.2d at p. 773), and thus it "impinges on the managerial freedom of directors." (*Aronson, supra,* 473 A.2d at p. 811; see also *South v. Baker* (Del. Ch. 2012) 62 A.3d 1, 13 [in derivative action shareholder "seeks to displace the board's authority"].) In *Aronson* the Delaware Supreme Court expressed the view that "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. The business judgment rule is an acknowledgment of the managerial prerogatives of

4

Delaware . . . . It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. [Citations.] Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." (473 A.2d at p. 812; see also *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart* (2004) 845 A.2d 1040, 1048-1049 (*Beam*) [plaintiff has burden to overcome presumption that directors were faithful to their fiduciary duties].) "Thus, absent an allegation of interestedness or disloyalty to the corporation, the business judgment rule prevents a judge or jury from second guessing director decisions if they were the product of a rational process and the directors availed themselves of all material and reasonably available information." (*In re Citigroup Inc. Shareholder Derivative Litigation* (Del. Ch. 2009) 964 A.2d 106, 124.)

The "key principle" underlying judicial analysis of a pleading asserting a derivative action is "that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties." (*Beam, supra,* 845 A.2d at p. 1048.) Because a shareholder in a derivative action contests the business judgment of corporate directors, "shareholders seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired, or . . . plead with particularity why demand is excused." (*Spiegel v. Buntrock*, *supra*, 571 A.2d at p. 773; see Del. Chancery Court Rule 23.1.)[4] "The purpose of pre-suit demand is to [en]sure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in

---

[4] Court of Chancery rule 23.1(a) requires the plaintiff in a derivative action to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

litigation, and to control any litigation [that] does occur." (*Spiegel v. Buntrock, supra,* 571 A.2d at p. 773; accord, *Brehm v. Eisner*, *supra*, 746 A.2d at p. 255.)

In order to be excused from the demand prerequisite to a derivative action, a shareholder must demonstrate through his or her pleading that a demand would have been futile. (*Kaplan v. Peat, Marwick, Mitchell & Co.* (Del. 1988) 540 A.2d 726, 730.) A showing of demand futility requires that the plaintiff allege "with particularity why the stockholder was justified in having made no effort to obtain board action." (*King v. VeriFone Holdings, Inc*. (Del. 2011) 12 A.3d 1140, 1145.) "As explained in *Aronson v. Lewis*, one ground for alleging demand futility is that a 'reasonable doubt' exists as to whether the board is capable of making an independent decision to assert the claim if demand were made. . . . Other reasons for showing demand excusal would be: (1) a majority of the board has a material financial or familial interest; (2) a majority of the board is incapable of acting independently for some other reason such as domination or control; or (3) the underlying transaction is not the product of a valid exercise of business judgment." (*Id.* at p. 1146, fn. 24.)

The reasonable doubt that the plaintiff must raise to create demand futility depends on whether he or she is challenging a "conscious decision by directors to act or refrain from acting" or, in the absence of board action, "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." (*Rales v. Blasband* (Del. 1993) 634 A.2d 927, 933, 934 (*Rales*).) If a decision of the board to act or decline to act is under scrutiny, we use the *Aronson* test described above; the business judgment of the board is at issue. (*Id.* at p. 933.) In those cases the pleading rules in Delaware require the shareholder plaintiff to allege *with particularity* "facts raising a reasonable doubt that the corporate action being questioned was properly the product of [its] business judgment." (*Brehm v. Eisner, supra,* 746 A.2d at pp. 254-255.) "[Chancery Court] Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not

6

required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.' . . . A prolix complaint larded with conclusory language . . . does not comply with these fundamental pleading mandates." (*Brehm v. Eisner, supra,* 746 A.2d at p. 254, fn. omitted.)

On the other hand, "[w]here there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application." (*Rales, supra,* 634 A.2d at p. 933.) "The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction." (*Ibid*.) Accordingly, in that case "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." (*Id.* at p. 934.)[5]

In this case the parties disagree as to which test of demand futility applies to plaintiff's claims. Plaintiff urges us to apply the *Aronson* test, based on his allegations of insider selling and dissemination of false and misleading information to the public. Defendants maintain that *Rales* provides the applicable standard. The debate is largely academic. "To satisfy either test, a plaintiff must 'comply with stringent requirements of factual particularity' of Court of Chancery Rule 23.1." (*Wood v. Baum* (Del. 2008) 953

---

[5] As the Delaware Supreme Court noted in *Rales*, "[t]his situation would arise in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where, as here, the decision being challenged was made by the board of a different corporation." (*Rales*, *supra*, 634 A.2d at p. 934, fns. omitted.)

A.2d 136, 140, citing *Brehm v. Eisner*, *supra*, 746 A.2d at p. 254.)[6] In any event, plaintiff insists that even under *Rales* he adequately pleaded demand futility because he raised "a reasonable doubt that six or more directors were able to independently consider a demand." We consider plaintiff's position in light of the allegations of the operative pleading, the third amended complaint. As will become evident, the outcome is the same under either *Aronson* or *Rales*.

*3. Demand Futility in the Third Amended Complaint*

Following demurrer on plaintiff's original complaint in superior court, plaintiff eliminated all causes of action except the first two, which alleged violation of Corporations Code section 25402 and breach of fiduciary duty, both based on alleged insider trading by the "Insider Selling Defendants." The third amended complaint, however, added back the original claims of breach of fiduciary duty and unjust enrichment. This final pleading asserted (1) violation of Corporations Code section 25402 by the 11 "Insider Selling Defendants"[7]; (2) breach of fiduciary duty and misappropriation of information by those same defendants, who sold stock while knowing that the company's financial condition was "materially overstated" to the public;

---

[6] Some courts have opined that a *Rales* inquiry in its practical application "makes germane all of the concerns relevant to both the first and second prongs of *Aronson*. For example, in a situation when a breach of fiduciary duty suit targets acts of self-dealing committed . . . by the two key managers of a company who are also on a nine-member board, and the other seven board members are not alleged to have directly participated or even approved the wrongdoing (i.e., it was not a board decision), the *Rales* inquiry will concentrate on whether five of the remaining board members can act independently of the two interested manager-directors. This looks like a first prong *Aronson* inquiry. [¶] When, however, . . . the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales*, excusing demand." (*Guttman v. Huang* (Del. Ch. 2003) 823 A.2d 492, 501.)

[7] The "Insider Selling Defendants" were Semel, Decker, Rosensweig, Nazem, Kern, Yang, Hippeau, Kozel, Kotick, Bostock, and Wilson.

8

(3) breach of fiduciary duty against all defendants for allowing the dissemination of misleading and inaccurate financial information to shareholders; (4) breach of fiduciary duty against four of the defendants (Joshi, Kern, Bostock, and Wilson) for failing to ensure the accuracy of press releases and financial statements and for allowing insider selling to occur; and (5) unjust enrichment by the Insider Selling Defendants.

Plaintiff's demand futility allegations consisted of the following concerns about each director. Yang could not independently consider a demand because of his "uniquely close relationship" with the company, having co-founded Yahoo! and "served as the 'Chief Yahoo!' from the Company's inception until his departure in 2008." Plaintiff also alleged that Yang faced a "substantial likelihood of liability" for having engaged in insider selling.

Bostock, according to plaintiff, had also participated in insider selling; moreover, he "knowingly authorized and/or permitted" the publication of false and misleading statements to the public, to securities analysts, and to shareholders. In addition, as a Board member and member of the Audit Committee, Bostock failed to remedy problems involving Yahoo!'s advertising services, the company's acquisition of Overture Services, Inc. (Overture), development of the Project Panama technology, and improvement of software to prevent "click fraud." In his capacity as a member of the Compensation Committee, Bostock "completely abdicated" his duty to determine appropriate compensation for Yahoo! executives by approving the "outrageous" compensation of Semel, the company's chairman of the board and CEO. Finally, Bostock's lack of independence was illustrated by his "blind and unreasonable support of Yang's rejection of Microsoft's offer out of hand" and his opposition to Carl Icahn's proposal to replace the incumbent board with 10 "independent" directors.

Kern was not disinterested and independent, according to the complaint, for the same reasons described in the allegations regarding Bostock. Kern also had allegedly engaged in insider trading and had failed to adhere to his duties as a member of both the

9

Audit Committee and the Compensation Committee. And, like Bostock, Kern was "dominated and controlled" by Yang and had thwarted Icahn's efforts to replace board members.

The allegations as to Hippeau overlapped those pertaining to Bostock and Kern. He, too, had engaged in "illegal insider selling" and had "authorized and/or permitted the issuance of false and misleading statements." Further, as a board member, he had failed to "act in the best interests of the Company's public shareholders" in the face of the problems with Project Panama, the Overture acquisition, and the click-fraud software.

The picture was similar as to Wilson: He had participated in insider selling, and he had abdicated his duties as a member of the compensation and audit committees for the same reasons as had his colleagues.

The superior court assumed, for purposes of discussion, that plaintiff had adequately pleaded insider trading in the first and second causes of action.[8] But of the "Insider Selling Defendants," only five were directors at the time plaintiff's action commenced: Yang, Bostock, Hippeau, Kern, and Wilson. Because plaintiff could not plead facts indicating that at least six of the 12 directors were interested because they had themselves engaged in insider trading, he had to identify at least one other director who was not disinterested and independent in order for him to show that demand would have been futile.

Plaintiff's efforts to allege demand futility with respect to the remaining directors focused on two of them: Burkle and Joshi, neither of whom was accused of insider

_____

[8] The court had previously recognized the inadequacy of an allegation of insider trading based solely on the sale of stock while in possession of material nonpublic information, without scienter. (See, e.g., *Guttman v. Huang, supra,* 823 A.2d at p. 502 [proper analysis focuses on whether the plaintiff has pleaded particularized facts creating a "sufficient likelihood of personal liability because [defendant directors] have engaged in material trading activity at a time when (one can infer . . . that) they knew material, non-public information about the company's financial condition"].)

10

trading.  The allegations targeting Burkle otherwise were almost identical to those directed at Bostock, Kern, and Hippeau in that Burkle "knowingly authorized and/or permitted the publication of false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders."  Like the other three, Burkle "benefitted from these statements by selling his Yahoo! stock at artificially inflated prices," although Burkle was *not* identified as an insider-selling defendant.  Also like the other three, Burkle allegedly failed to take any action to correct problems associated with Project Panama, the acquisition of Overture, or click-fraud prevention software.  Burkle, too, was a member of the Compensation Committee, and he approved Semel's "obviously egregious and excessive" compensation.  All of this conduct, plaintiff insisted, demonstrated that Burkle "clearly puts his own interests ahead of those of Yahoo!'s public shareholders, to whom he owed fiduciary duties."

Joshi also was identified as a director who was not independent and disinterested.  He, too, was alleged to have abdicated his duties as a member of the Audit Committee:  He failed to investigate and stop click-fraud and concealed the issue, and he failed to ensure control of and pursue redress for insider trading.  Additionally, as an Audit Committee member he faced a "substantial likelihood of personal liability" because he and the other committee members were responsible for the "false financial statements he and other directors made and for the illegal insider selling committed by the Insider Selling Defendants."  Thus, plaintiff asserted, "there is no way that Joshi can possibly be considered independent for purposes of disinterestedly considering a demand to bring a lawsuit against himself and his fellow Director Defendants."

Both Burkle and Joshi were defendants in the third cause of action, in which plaintiff alleged that all of the individual defendants were liable for breach of fiduciary duty "by causing or allowing the Company to disseminate to Yahoo[!] shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press

11

releases, and other public statements and disclosures as detailed herein. Further, each of the Individual Defendants failed to correct the Company's publicly reported financial results and guidance." In plaintiff's view, "[t]hese actions could not have been a good faith exercise of prudent business judgment."

Joshi was also named in the fourth cause of action (along with Kern, Bostock, and Wilson) for breach of fiduciary duty by (1) "willfully" ignoring and failing to correct the "obvious and pervasive problems" with the company's financial statements, press releases, accounting and internal control practices and procedures"; (2) failing to ensure the accuracy of those press releases and financial statements; and (3) "consciously or recklessly" allowing insider selling to occur.

All of the allegations regarding Burkle and Joshi's "abdication" of their fiduciary duty pertained to failures to investigate and remedy misconduct or their exercise of poor judgment in addressing problems with software and public financial reports. As the superior court recognized, however, a mere negligent failure to monitor problems and control risks is insufficient to ascribe bad faith to the directors. Nor can bad faith be inferred solely from a director's membership on an audit committee. (*Wood v. Baum*, *supra*, 953 A.2d at p. 142.) As the Supreme Court of Delaware has emphasized, even gross negligence is insufficient to constitute bad faith in what amounts to an oversight challenge. (*In re Walt Disney Co. Derivative Litigation* (Del. 2006) 906 A.2d 27, 65 (*Disney*) ["grossly negligent conduct . . . does not and cannot constitute a breach of the fiduciary duty to act in good faith"]; see also *In re Caremark Int'l Derivative Litig.* (Del.Ch.1996) 698 A.2d 959, 971 ["sustained or systematic failure of a director to exercise reasonable oversight" necessary to establish lack of good faith].)

On the other hand, "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty

12

to act, demonstrating a conscious disregard for his duties." (*Disney, supra,* 906 A.2d at p. 67.) The "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." (*Stone ex rel. AmSouth Bancorporation v. Ritter* (Del. 2006) 911 A.2d 362, 370, fns. omiccted.)

In this case plaintiff's allegations of bad faith in essence did accuse the directors of intentionally failing to act in Yahoo!'s best interests, "demonstrating a conscious disregard for [their] duties." (*Ibid*.) But as the superior court pointed out, even if plaintiff had set forth the *particular* facts that demonstrated this bad faith (and not just the details of the problems the directors allowed to occur), the third and fourth causes of action for breach of fiduciary duty had been abandoned in the first and second amended complaints following the sustaining of the demurrer to the original complaint. The previous order sustaining the demurrer to the second amended complaint had been limited in scope: The court had then allowed amendment "solely to permit Plaintiff an opportunity to plead particularized facts showing how a sufficient number of directors are beholden to an interested director, officer or other controlling person for purposes of excusing demand." Consequently, the court ruled, plaintiff's reintroduction of allegations of false reporting and failure to maintain adequate internal controls "was untimely and went beyond the limited scope of leave to amend that was clearly stated in the court's July 11, 2011 order." The court therefore struck the third and fourth causes of action "as not filed in conformity with a court order."

We are not convinced that this ruling constituted an abuse of discretion. (See *Harris v. Wachovia Mortg., FSB* (2010) 185 Cal.App.4th 1018, 1023 [plaintiff may amend complaint only as authorized by and within the scope of the order granting leave to amend]; see also Code Civ. Proc., § 436 [court may strike any part of pleading not in

13

conformity with a law, rule, or court order].)  These claims not only violated the order granting leave to amend the second amended complaint but provided no improvement on the same claims he resurrected from the *original* complaint, which had failed on demurrer before a different judge of the superior court.

The superior court then addressed the subject on which leave to amend *had* been granted, Yang's alleged domination and control of the identified directors.  "A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will.  [Citation.]  A director may also be deemed 'controlled' if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively." (*Telxon Corp. v. Meyerson* (Del. 2002) 802 A.2d 257, 264; see also *Aronson*, *supra*, 473 A.2d at p. 815 [plaintiff must show "through personal or other relationships the directors are beholden to the controlling person"]; accord, *Rales*, *supra*, 634 A.2d at p. 936 [plaintiff had to show directors were beholden to Rales brothers "or so under their influence that their discretion would be sterilized"]; *Beam, supra,* 845 A.2d at p. 1051-1052 [social and business affinity insufficient standing alone to negate presumption that directors are unable to consider demand independently].)

In light of the stricken causes of action, the superior court disregarded the allegations that pertained to false and misleading financial statements and excessive compensation of Semel, focusing strictly on the "domination and control" allegation. Although plaintiff had pleaded control by Yang with respect to six directors (Bostock, Hippeau, Kern, Wilson, Joshi, and Burkle), the allegation was based on the vague assertion that Yang "caused" these directors not only to reject the Microsoft offer but to "thwart further advances from Microsoft" by adopting a "facially invalid" employee

14

severance plan. [9] It was only the "fact that [these six directors] *allowed* Yang to adopt these outrageously self-interested entrenchment mechanisms" that allegedly demonstrated Yang's domination and control.

As the superior court pointed out, "there is no cause of action arising out of this conduct." More importantly, the allegation was circular and conclusory. Plaintiff asserted that Yang "so dominated and controlled" these six directors that he "caused" them to reject the Microsoft offer; and the fact that they "allowed" Yang to adopt defensive "entrenchment mechanisms" in itself "amply demonstrate[s] the domination and control that Yang exerts over the rest of Yahoo[!]'s board." Missing from plaintiff's complaint are the particularized facts that permit an inference that because of Yang's *relationship* with each director, each acted under Yang's influence in making the challenged decisions. Thus, even setting aside the rejected claims, we agree with the lower court that these allegations did not provide the required particularity.

As noted earlier, plaintiff made additional "domination and control" allegations specific to Bostock, Kern, and Burkle. Only those directed at Burkle are of concern since, for purposes of this appeal, plaintiff is assumed to have adequately pleaded illegal insider trading as to Bostock and Kern. Nevertheless, as to Burkle's allegiance to Yang, the outcome of the pleading is the same. Burkle was allegedly beholden to Yang

---

[9]  Plaintiff specifically alleged that these directors demonstrated their "lack of independence and bad faith" by following Yang's defensive measures designed to thwart the Microsoft takeover, including the "facially invalid poison pill under the guise of an employee severance plan." Instead of protecting the interests of the company and its shareholders, these six defendants (along with Wilderotter) "acceded to Yang's self-interested conduct on multiple occasions." The current directors were "hopelessly conflicted," as any action against themselves would "expose their own misconduct" and force them to "take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do." Moreover, changes in their liability insurance policies had eliminated coverage for any action brought directly by Yahoo! against them. Only a derivative action would ensure coverage and provide for recovery by the Company.

because, as a member of the Compensation Committee, he approved "the employee severance plan in response to the Microsoft offer, and his blind and unreasonable support of Yang's rejection of Microsoft's offer out of hand, before Burkle o[r] the other directors even knew the price being offered by Microsoft."

This allegation is plainly insufficient. Just as in the case of the other directors, plaintiff did not set forth specific facts showing a relationship between Yang and Burkle which demonstrated that Burkle was beholden to Yang. "The shorthand shibboleth of 'dominated and controlled directors' is insufficient." (*Aronson*, *supra*, 473 A.2d at p. 816.) The bare fact that Burkle supported Yang's rejection of the Microsoft offer (along with his approval of defensive measures against Microsoft) does not, in itself, "demonstrate" Yang's domination and control of Burkle; it only affirms plaintiff's disagreement with Burkle's decision to oppose the Microsoft takeover.

In summary, plaintiff failed to plead particularized facts manifesting a reasonable doubt that the board could not have exercised its independent and disinterested judgment in responding to his demand, had he made one at the time he brought the action. The demurrer to the third amended complaint was properly sustained.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

PREMO, Acting P. J.


_____

MÁRQUEZ, J.

16

Trial Court:                    Santa Clara County Superior Court


Trial Judge:                    Hon. James P. Kleinberg


Attorneys for Plaintiff and
  Appellant:                   Chapin Fitzgerald Sullivan & Bottini and
                                Francis A. Bottini, Jr. and
                                Keith M. Cochran;
                                Bottini & Bottini and
                                Francis A. Bottini, Jr.



Attorneys for Defendants and
  Respondents:                 Morrison & Foerster and
                                Jordan Eth,
                                Anna Erickson White and
                                Mark R.S. Foster



*Leyte-Vidal v. Semel, et al.*

H037762