Filed 8/27/20  Wessels v. Read CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WILLIAM WESSELS,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>RORY P. READ et al.,<br><br>      Defendants and Respondents. | H046255<br>(Santa Clara County<br>Super. Ct. No. CV262486) |

In this shareholder derivative case, plaintiff and appellant William Wessels (plaintiff) alleges certain current and former directors and officers of nominal defendant and respondent Advanced Micro Devices, Inc. (AMD) (collectively, defendants) breached their fiduciary duties, wasted corporate assets, and were unjustly enriched.

Plaintiff contends the trial court erred when it sustained defendants' demurrer without leave to amend.  The trial court concluded that plaintiff failed to sufficiently allege, as required by Delaware law, that it would have been futile for him to make a presuit demand that the AMD board of directors bring the lawsuit.  On appeal, plaintiff asserts the complaint adequately pleads that a majority of the board of directors face a substantial likelihood of personal liability for breach of the fiduciary duty of loyalty and acting in bad faith, thus excusing him from the presuit demand requirement.  Plaintiff further contends his three causes of action for breach of fiduciary duty, waste, and unjust enrichment were sufficiently pleaded.  Finally, he argues the trial court abused its

discretion by failing to grant his request for leave to file a surreply brief in connection with defendants' demurrer.

For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

A. *The Parties and Relevant Third Parties*

On appeal from the sustaining of a demurrer, we accept as true the following facts as alleged in the operative complaint.[2] (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1189, fn. 1.) We also accept as true facts of which a court may take judicial notice. (*Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73, 78, review granted Aug. 12, 2020, S262634.)

At all relevant times, plaintiff was and remains an AMD shareholder. Respondent and nominal defendant AMD is a Delaware corporation headquartered in Sunnyvale, California. AMD is a semiconductor company that designs, develops, and sells a variety of microprocessors. It is publicly-traded and files periodic reports with the United States Securities and Exchange Commission (SEC).

The individual defendants are 12 former or current AMD officers or directors. The three officers named in the complaint are Rory Read, AMD's former president, Chief Executive Officer (CEO), and a director from August 2011 to October 2014; Thomas J.

---

[1] Portions of plaintiff's briefs on appeal were filed under seal pursuant to this court's orders of March 20, 2019, and August 5, 2019. Having determined that the facts relevant to our decision on the appeal are no longer subject to an "overriding interest that overcomes the right of public access" to the records (see Cal. Rules of Court, rule 2.550(d); *NBC Subsidiary* (*KNBC-TV*), *Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1222, fn. 46), we informed the parties on July 9, 2020, of the court's intent to unseal plaintiff's briefs. Neither party filed an opposition or response. Accordingly, concurrent with the filing of this opinion, we hereby order the records previously filed under seal by orders dated March 20, 2019, and August 5, 2019, be unsealed in their entirety. (Cal. Rules of Court, rule 2.551(h).)

[2] The operative complaint is the "Amended Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment," filed on January 30, 2018.

2

Seifert, AMD's former Chief Financial Officer (CFO) and interim CEO; and Lisa T. Su, AMD's current CEO. The nine remaining defendants are current or former directors of AMD, namely Bruce L. Claflin, W. Michael Barnes, Henry WK Chow, John E. Caldwell, H. Paulett Eberhart, Nicholas M. Donofrio, Robert B. Palmer, Craig A. Conway, and Waleed Muhairi. Five other directors (Ahmed Yahia Al Idrissi (Yahia), Nora M. Denzel, Martin Edelman, John R. Harding, and Michael J. Inglis) are not named as defendants in the complaint but were members of AMD's 12-person board of directors on March 20, 2014, when plaintiff's complaint was originally filed. We refer to this 12-person board of directors (comprised of Read, Claflin, Barnes, Eberhart, Chow, Caldwell, Donofrio, Yahia, Denzel, Edelman, Harding, and Inglis), as the " 'Demand Board.' "

B. *AMD's Llano Product*

The complaint alleges wrongdoing by defendants in 2011 and 2012 associated with one of AMD's key products, the Llano Accelerated Processing Unit ("Llano"). In 2010, AMD announced that it would be launching Llano, a series of microprocessors that would be made according to a new manufacturing process. AMD touted Llano as a revolutionary product that would be used in desktop and mobile platforms. Although AMD had planned to launch Llano in 2010, its debut was pushed back to June 2011 because of significant manufacturing problems.

In order to manufacture Llano, AMD relied on a third-party company previously owned by AMD called GlobalFoundries to produce integral parts of the Llano, specifically the 32-nanometer wafer. GlobalFoundries struggled to produce sufficient quantities of usable wafers for AMD. As a result of these manufacturing problems, Llano experienced significant production and supply issues throughout 2011.

By the end of 2011, AMD had resolved its supply issues with GlobalFoundries. By early to mid-2012, AMD was able to produce an ample supply of Llano. However, due in part to the prior supply issues in 2011 and AMD's announcement of a second

3

generation product called "the Trinity," the demand for Llano was less than anticipated. As a result, AMD was left in 2012 with a large inventory of unsold Llano.

In July 2012 and October 2012, AMD announced decreases in revenue and gross margins and finally a $100 million inventory write-down due to the over-stated value of Llano. AMD's stock price fell sharply. According to the complaint, October 19, 2012, is the date on which the "full extent of the Llano's laundry list of failures was fully revealed." By that time, AMD's market capitalization had fallen by 73 percent.

The complaint alleges that, prior to these market announcements in July and October 2012, AMD officers and directors had made or had allowed to be made multiple "grossly misleading" statements about demand for Llano and its production. Most of these statements were made by either Read or Seifert. For example, in April 2011, Seifert (AMD's then CFO and interim CEO) stated in a conference call that the yields related to Llano production were " 'on target' " and that the production "issues were 'behind' the Company."

After Read was named AMD's president, CEO, and a director in August 2011, Read also made "overly positive statements" to analysts and investors about Llano and expressed confidence in GlobalFoundries' manufacturing. By contrast, in both internal AMD e-mails and e-mails with representatives at GlobalFoundries, Read essentially expressed the opposite, for instance noting that he was " 'not confident in [GF's] ability to . . . deliver to the 4Q GF commitments.' "

C. *Internal Warnings to the Board Related to Llano*

The complaint alleges the defendant directors were aware of the supply and demand problems with Llano. On six occasions between March and October 2011, the board was warned explicitly in presentations and reports of "significant supply and demand issues" related to Llano. For example, in October 2011, the board held a meeting and was presented with a lengthy presentation titled " 'Supply Chain Deep-Dive.' " The presentation discussed difficulties with the manufacturing and supply of Llano and

4

evaluated the problems with GlobalFoundries on a "per-quarter basis for 2011, noting that [GlobalFoundries] struggled on 'all key factory performance metrics' in Q3, and that Q4 delivery promises were at best 'optimistic' given that [GlobalFoundries'] commitments were 'heavily back-end loaded' and based on '[a]gressive yield assumptions.' "

On February 20, 2012, defendant director Claflin e-mailed Read and stated that there had been a recent board meeting at which "defendant Muhairi (a member of AMD's Board and also a [GlobalFoundries] board member) informed the [AMD] Board that '[GlobalFoundries] had been asked to hold inventory because [AMD] didn't have demand for it.' " (Emphasis and italics omitted.)

On February 24, 2012, AMD filed an annual report (Form 10-K) with the SEC. The complaint alleges statements in the Form 10-K mischaracterized the demand for Llano. The complaint alleges the Form 10-K also misrepresented the manufacturing issues by stating "performance improved 'during the second half of 2011,' " while these improvements in fact did not begin to occur until the end of 2011.

D. *Procedural History*

1. Initiation of Derivative Shareholder Lawsuit and Stay

On March 20, 2014, plaintiff filed in Santa Clara County Superior Court the lawsuit at issue here, a shareholder derivative lawsuit we refer to as the "derivative shareholder lawsuit." A few months earlier, a different set of plaintiffs had filed in federal court a class action suit, *Hatamian, et al. v. Advanced Micro Devices, Inc., et al.* (N.D. Cal. No. 4:14-cv-226-YGR) (*Hatamian*)), that asserted violations of the federal securities laws. While the legal claims in *Hatamian* differed from those in the derivative shareholder lawsuit, the allegations in both cases stemmed from essentially the same events in 2011 and 2012 involving Llano. The defendants in the *Hatamian* action were AMD and certain of its officers (including Read), but not any of the director defendants

5

named in the derivative shareholder lawsuit.[3] Based in part upon forthcoming access to discovery in the *Hatamian* litigation, plaintiff agreed to a stay in the derivative shareholder lawsuit.

On May 5, 2014, the superior court entered a stipulated order to temporarily stay the derivative shareholder lawsuit (stipulation). The stipulation stated that it was based in part on "Defendants' agreement to provide Plaintiff with reasonably prompt access to discovery produced by defendants in the [*Hatamian* action]" and stated that a motion to dismiss was pending in *Hatamian*, triggering the duration of the temporary stay upon the entry of an order on the motion to dismiss in the federal securities case. One paragraph of the stipulation states, "The composition of AMD's Board of Directors that will be considered in connection with determining whether Plaintiff has pled facts sufficient to raise a reasonable doubt that a pre-litigation demand on the Company's Board of Directors would have been futile shall be the composition of the Board of Directors as of March 20, 2014, the date this action was initiated." Defendants did not file a demurrer or answer to the 2014 complaint.

In March 2015, the federal court in *Hatamian* denied defendants' motion to dismiss and later certified a class. The parties in *Hatamian* engaged in extensive discovery, including the production and review of approximately 2.5 million pages of documents and the taking of over 30 depositions. The parties in that litigation reached a settlement prior to a ruling on a pending motion for summary judgment. In late October

---

[3] In addition to the federal securities case, two federal shareholder derivative cases based on the problem with Llano were initiated by two other AMD shareholders (David Hamilton and Jake Ha). The Ninth Circuit Court of Appeals affirmed the dismissal of Ha's complaint and reversed and remanded the district court's dismissal of Hamilton's complaint, ruling that the district court erred by refusing to consider "the allegations in Hamilton's complaint that were based on information received in the *Hatamian* discovery materials." (*Hamilton v. Barnes* (9th Cir., Mar. 16, 2020, No. 18-16953), 806 Fed.Appx. 536, 538, 2020 WL 1243737 at *2.)

2017, the federal district court overseeing the *Hatamian* litigation granted preliminary approval of a $29.5 million settlement.

### 2. 2018 Amended Complaint

In January 2018, using information from the discovery produced in *Hatamian*, plaintiff filed an amended complaint in the derivative shareholder lawsuit, which is the operative complaint at issue here (complaint). Consistent with the original complaint filed in 2014, the complaint alleges three causes of action against 12 individual defendants (former and current directors and officers of AMD) for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. The complaint builds upon the prior allegations of the 2014 complaint by incorporating various documents produced in discovery in *Hatamian*. The complaint states the "documents produced by defendants in discovery" confirm that "the Individual Defendants had extensive knowledge of the Llano disaster at every step of the way."

Plaintiff acknowledges in the complaint he did not make any demand on the Demand Board to institute this action, alleging that such a demand would be futile. The complaint states that the "relevant Board of AMD for demand futility purposes" was the 12-member board as it was composed on the date the original complaint was filed on March 20, 2014. The complaint alleges that pursuant to a stipulation and order filed in April 2015,[4] plaintiff and defendants "stipulated and agreed that '[t]he composition of AMD's Board of Directors that will be considered in connection with determining whether Plaintiff has pled facts sufficient to raise a reasonable doubt that a pre-litigation demand on the Company's Board of Directors would have been futile shall be the composition of the Board of Directors as of March 20, 2014, the date [the Complaint was

---

[4] Following the order denying the motion to dismiss in *Hatamian*, the register of actions in the derivative shareholder lawsuit reflects another stipulation to stay the case that was filed and entered by the trial court in 2015. The parties rely (as did the trial court) on the March 20, 2014 stipulation, and we accept this stipulation as relevant to our analysis. (See fn. 7, *post*.)

first filed].' " (Emphasis and italics omitted.) On that date, AMD's board (i.e., the Demand Board) was composed of twelve individuals: defendants Read, Claflin, Barnes, Eberhart, Chow, Caldwell, and Donofrio, and non-defendants Yahia, Denzel, Edelman, Harding and Inglis.

In support of his assertion that it would have been futile to make a presuit demand to the board to pursue the litigation, plaintiff alleges that seven of the 12-member Demand Board—defendants Read, Claflin, Barnes, Eberhardt, Chow, Caldwell, and Donofrio—were unable to objectively evaluate whether to bring a lawsuit on behalf of AMD, because they themselves faced a substantial likelihood of personal liability for their misconduct. We examine the demand futility allegations related to these seven defendants in further detail below.

### 3. Defendants' Demurrer

In April 2018, defendants demurred to all three causes of action in the complaint on the basis that plaintiff had not adequately pleaded demand futility. Among other arguments, defendants asserted that plaintiff had not pleaded demand futility to the "proper" board, because the composition of the board had changed significantly since 2014, and he had not pleaded particularized facts showing that the director defendants were exposed to any substantial liability for any improper statements connected to Llano.

In connection with their demurrer, defendants filed a request for judicial notice of 24 documents and submitted the declaration of Ashley Hodge (Hodge Declaration), which attached these documents as exhibits. The 24 exhibits included documents produced in the *Hatamian* litigation and cited by plaintiff in his complaint, SEC filings by AMD, and AMD press releases.

The Hodge Declaration included AMD's amended and restated certificate of incorporation which contains a provision that exculpates the directors of AMD for certain monetary damages. The exculpatory provision states in pertinent part that a director of AMD "shall not be personally liable to the corporation or its stockholders for monetary

8

damages for breach of fiduciary duty as a director, except liability [] for any breach of the director's duty of loyalty to the corporation or its stockholders" or "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."

Plaintiff filed an opposition to defendants' demurrer, arguing he adequately pleaded demand futility. Plaintiff did not oppose defendants' request for judicial notice.

Defendants submitted a reply brief, attaching additional exhibits (including other documents produced in the *Hatamian* litigation) and a request for judicial notice of them.

Following defendants' submission of their reply, plaintiff filed a request to file a surreply and a two-page proposed surreply. He contended defendants had raised two new arguments in their reply brief that he had not had an opportunity to address.

### 4. Trial Court's Order on the Demurrer

Prior to the hearing on defendants' demurrer, the trial court issued a written tentative ruling sustaining defendants' demurrer without leave to amend. Plaintiff contested the tentative ruling, and the parties appeared for a hearing on July 20, 2018. The trial court did not rule on plaintiff's request to file a surreply, and plaintiff did not raise the issue at the hearing.

At the hearing on defendants' demurrer, plaintiff argued he had sufficiently alleged defendants' "actual knowledge" to show demand futility. The trial court responded, "But knowledge of what?" Plaintiff explained it was "knowledge of the serious issues regarding the [Llano]." The trial court observed at the hearing that the documents referenced in the complaint are a "mixed bag," in terms of positive and negative information about Llano. After hearing argument by the parties, the trial court took the matter under submission.

A few days later, on July 23, 2018, the trial court filed a written order consistent with its tentative ruling that sustained the demurrer without leave to amend. Addressing defendants' argument that plaintiff alleged demand futility against the wrong board, the trial court found that the May 5, 2014 stipulation by the parties unambiguously reflected

their intent that demand futility be evaluated against the board as it was composed on March 20, 2014. Accordingly, the trial court determined the correct board was the 2014 board (when the original complaint was filed), rather than the 2018 board in existence when plaintiff filed the operative complaint. The trial court determined that *In re Caremark Int'l. Inc. Derivative Litig.* (Del. Ch. 1996) 698 A.2d 959 (*Caremark*) provided the applicable legal framework for the demand futility analysis. We discuss this standard further below.

The trial court also addressed defendants' contention that "documents relied on by Plaintiff to show knowledge of problems also included other more positive information." The trial court stated, "[t]his is true to an extent" and pointed to the October 2011 presentation which raised "certain problems" but also stated "the issues were being actively addressed" by the Board.

The trial court concluded that plaintiff had not adequately alleged demand futility because he failed to allege particularized facts showing bad faith by a majority of the directors. The trial court noted that six of the directors (Claflin, Barnes, Eberhardt, Chow, Caldwell, and Donofrio) were "accused only of signing documents," and plaintiff did not allege particularized facts demonstrating they had acted in bad faith. "Without bad faith by those directors," and given that there was no dispute that three other directors (Denzel, Harding, and Inglis) were capable of considering a demand, the trial court found that plaintiff "cannot show a majority of the board faces a substantial likelihood of personal liability." Therefore, plaintiff failed to establish demand futility. Moreover, because plaintiff failed to explain what new allegations could be added to the complaint, the trial court sustained defendants' demurrer without leave to amend.

## II. DISCUSSION

On appeal, plaintiff primarily contends that the trial court erred in sustaining the demurrer because it improperly drew numerous inferences in defendants' favor and discounted the "totality" of the facts alleged in the complaint demonstrating the futility of

a presuit demand.[5]  Plaintiff argues the complaint and the documents incorporated by reference in the complaint support the reasonable inference that the director defendants breached their duty of loyalty and acted in bad faith because they knew "AMD's public statements were false and misleading" and "[f]ail[ed] to correct known misstatements."[6]

Defendants assert that the trial court correctly concluded that plaintiff failed to sufficiently allege demand futility by reference to the 2014 Demand Board.[7]  They contend that plaintiff failed to allege particularized facts to show the directors acted in bad faith.

---

[5] The record does not contain a judgment of dismissal.  Instead, plaintiff appealed from the trial court's July 23, 2018 written order sustaining the demurrer to all of the complaint's causes of action without leave to amend.  As "[t]he existence of an appealable judgment is a jurisdictional prerequisite to an appeal," (*Doran v. Magan* (1999) 76 Cal.App.4th 1287, 1292), we ordinarily would not have jurisdiction over plaintiff's appeal.  However, " 'when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment.' " (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 527, fn. 1.)  We will accordingly deem the order on the demurrer to incorporate a judgment of dismissal and will review the merits of plaintiff's challenge to the order.

[6] While plaintiff in his opening brief on appeal contended that the trial court also erred by denying him leave to amend the complaint, he has withdrawn that claim in his reply brief.  Therefore, we do not further address the trial court's denial of leave to amend the complaint.

[7] As described above, the trial court's ruling addressed whether plaintiff should have alleged demand futility on the board existing when the amended complaint was filed in 2018, rather than on the 2014 board.  Relying on the May 5, 2014 stipulation, the trial court ruled that the stipulation meant that demand futility must be alleged as to the board existing in March 2014 "notwithstanding the amendment to the pleadings."  We asked the parties for supplemental briefing on whether the May 5, 2014 stipulation had any bearing on our de novo review of the adequacy of plaintiff's pleading of presuit demand futility. In response, both parties agree that we should consider demand futility under the facts as established by the stipulation, although the parties interpret the stipulation differently. We agree with the plaintiff and the trial court that the stipulation unambiguously defines the Demand Board as the board existing as of when the action was initiated, that is March 20, 2014.  Consistent with the stipulation, we consider plaintiff's demand futility allegations against the members of the board as it existed in March 2014.

A. *Standard of Review*

In reviewing the trial court's order sustaining defendants' demurrer, " 'we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose.' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.) "The adequacy of the pleading of presuit demand futility may be resolved at the pleading stage of litigation, a ruling we review de novo." (*Charter Township of Clinton Police & Fire Retirement System v. Martin* (2013) 219 Cal.App.4th 924, 934; see also *Leyte-Vidal v. Semel* (2013) 220 Cal.App.4th 1001, 1007 (*Leyte-Vidal*)) [de novo standard applies to a shareholder derivative lawsuit filed in California state court involving a Delaware corporation].) "Like the trial court, we assume the truth of all properly pleaded factual allegations. 'Whether the plaintiff will be able to prove these allegations is not relevant; our focus is on the legal sufficiency of the complaint.' [Citations.] 'Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' [Citation.] We do not, however, assume the truth of 'mere contentions or assertions contradicted by judicially noticeable facts.' " (*Ibid.*) Because AMD is a Delaware corporation, Delaware law governs our consideration of the adequacy of plaintiff's pleading of demand futility. (*Ibid.*)

B. *Legal Principles*

### 1. The Demand Requirement

Under Delaware law, the board of directors, rather than its shareholders, manages the business and affairs of a Delaware corporation. (See Del. Code Ann. tit. 8, § 141, subd. (a).) In accordance with this fundamental principle, a decision to bring or not to bring a lawsuit to redress harm to the corporation belongs to the corporation rather than to any single shareholder. (*Braddock v. Zimmerman* (Del. 2006) 906 A.2d 776, 784.) When a shareholder believes the corporation has been harmed, Delaware law requires that "a derivative plaintiff must give the board of directors the opportunity to exercise that substantive right or demonstrate that the board is incapable of evaluating demand in a

12

disinterested and independent manner, i.e., because that demand would be futile, it is excused." (*Ibid*.)

Shareholders face a heavy, "though not insurmountable" burden when bringing a shareholder derivative lawsuit. (*Brehm v. Eisner* (Del. 2000) 746 A.2d 244, 267.) The derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." (Del. Ch. Ct. Rules, rule 23.1 (hereafter Rule 23.1); *Leyte-Vidal*, *supra*, 220 Cal.App.4th at p. 1009 [discussing Rule 23.1].) "Under Rule 23.1, the plaintiff has 'a heightened burden to plead particularized facts establishing a "reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." ' " (*McElrath v. Kalanick* (Del. 2020) 224 A.3d 982, 990 (*McElrath*).)

"The purpose of the demand requirement is not to insulate defendants from liability; rather, the demand requirement and the strict requirements of factual particularity under Rule 23.1 'exist[] to preserve the primacy of board decisionmaking regarding legal claims belonging to the corporation.' " (*In re Citigroup Inc. Shareholder Derivative Litigation* (Del. Ch. 2009) 964 A.2d 106, 120 (*Citigroup*).) Overall, "directors are entitled to a *presumption* that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." (*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart* (Del. 2004) 845 A.2d 1040, 1048–1049, fn. omitted (*Beam*).)

Here, to overcome that presumption, the complaint's allegations must support a reasonable inference that at least six of AMD's twelve directors on the Demand Board "could not have exercised its independent and disinterested judgment in responding to his demand, had he made one at the time he brought the action." (*Leyte-Vidal*, *supra*, 220

Cal.App.4th at p. 1017; see *Beam*, *supra*, 845 A.2d at p. 1046, fn. 8 [noting demand excused where board is evenly divided between interested and disinterested directors].)

> 2. Demand Futility Tests Under Delaware Law and Application to *Caremark* Claims

Delaware courts have developed two tests to assess the futility of making a presuit litigation demand on a board of directors. As summarized by the Delaware Supreme Court, "[t]he *Aronson* test applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties. That test requires that the plaintiff allege particularized facts creating a reason to doubt that '(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.' " (*Wood v. Baum* (Del. 2008) 953 A.2d 136, 140 (*Wood*).)

The second test applies to "*Caremark*" claims. (See *Caremark*, *supra*, 698 A.2d 959.) Under *Caremark*, the " 'claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation.' " (*Stone ex rel. AmSouth Bancorporation v. Ritter* (Del. 2006) 911 A.2d 362, 364 (*Stone*).) In a *Caremark* claim, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.' " (*Ibid*.)

The Delaware Supreme Court has ruled that "[f]or alleged violations of the board's oversight duties under *Caremark*, the test articulated in [*Rales v. Blasband* (Del. 1993) 634 A.2d 927, 936 (*Rales*)] applies to the demand futility inquiry. Under *Rales*, the plaintiffs must plead particularized facts raising 'reasonable doubt of the board's independence and disinterestedness when the demand would reveal board inaction of a nature that would expose the board to "a substantial likelihood" of personal liability.' "

(*City of Birmingham Retirement and Relief System v. Good* (Del. 2017) 177 A.3d 47, 55, fn. omitted (*City of Birmingham*).)

As noted above, the trial court found that plaintiff's case involved a *Caremark* claim. Under *Caremark*, "a director must make a good faith effort to oversee the company's operations. Failing to make that good faith effort breaches the duty of loyalty and can expose a director to liability. In other words, for a plaintiff to prevail on a *Caremark* claim, the plaintiff must show that a fiduciary acted in bad faith—'the state of mind traditionally used to define the mindset of a disloyal director.' [¶] Bad faith is established, under *Caremark*, when 'the directors [completely] fail[] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.' In short, to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it." (*Marchand v. Barnhill* (Del. 2019) 212 A.3d 805, 820–821, fns. omitted (*Marchand*).)

Plaintiff contends in his opening brief that the trial court incorrectly interpreted his claim as falling under *Caremark*. We disagree. Based on our independent review of the complaint, we conclude it contains numerous allegations typical of a *Caremark* claim, such as that defendants (including the director defendants) "violated their duty of good faith by creating a culture of lawlessness within AMD, and/or consciously failing to prevent to [*sic*] Company from engaging in the unlawful acts complained of herein." Moreover, as plaintiff states on appeal, a core theory of liability in the complaint is that the director defendants knew "AMD's public statements were false and misleading" and they "fail[ed] to correct known misstatements." That theory is a *Caremark* claim implicating the failure of oversight. Therefore, the *Rales* test is the applicable standard for analyzing demand futility. (*City of Birmingham*, *supra*, 177 A.3d at p. 55.)

15

To establish demand futility sufficient to survive demurrer, the complaint's allegations must support a reasonable doubt that a majority of the board was disinterested because they breached their duty of loyalty. "[D]emand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.' " (*Citigroup*, *supra*, 964 A.2d at p. 121.)

Demand futility is assessed on a director-by-director basis, and a derivative complaint must "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." (*Desimone v. Barrows* (Del. Ch. 2007) 924 A.2d 908, 943.) We turn now to the standards for determining when a director as a matter of law could not have exercised disinterested business judgment in evaluating a presuit demand because he or she faced a substantial likelihood of liability.

3. <u>Substantial Likelihood of Personal Liability and the Duty of Loyalty</u>

The potential for liability must rise to " 'a substantial likelihood' " rather than " 'a mere threat.' " (*Rales*, *supra*, 634 A.2d at p. 936.) Furthermore, AMD's charter contains an exculpatory provision that limits the scope of its directors' liability. (See *Wood*, *supra*, 953 A.2d at p. 141.) Based on the terms of the exculpatory provision, the directors would face liability only for breach of the fiduciary duty of loyalty or "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."

"[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith." (*Stone*, *supra*, 911 A.2d at p. 370.) Plaintiff claims he adequately pleaded that a majority of the board of directors face a substantial likelihood of liability because they breached their duty of loyalty. As plaintiff does not

16

allege directors faced a conflict of interest, pecuniary or otherwise, we focus on their alleged failure to act in good faith.

The "failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." (*Stone*, *supra*, 911 A.2d at p. 369.) The Delaware Supreme Court has identified three of the " 'most salient' " examples of bad faith: " 'the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.' " (*In re Walt Disney Co. Derivative Litigation* (Del. 2006) 906 A.2d 27, 67.) More recently, the Delaware Supreme Court confirmed that a "showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff to demonstrate intentional wrongdoing by the board." (*McElrath*, *supra*, 224 A.3d at p. 993.)

A breach of the duty of loyalty may also arise when directors disclose false information to shareholders. Directors have "the duty to deal with their stockholders honestly." (*Malone v. Brincat* (Del. 1998) 722 A.2d 5, 10.) "When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty." (*Id.* at p. 14.) A breach of the duty of loyalty in the context of a disclosure requires more than mere negligence. "A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty." (*Zirn v. VLI Corp.* (Del. 1996) 681 A.2d 1050, 1062.) In the context of a non-exculpated disclosure claim, "plaintiffs must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly or intentionally.' " (*Citigroup*, *supra*, 964 A.2d at p. 132.)

17

We now turn to the complaint's allegations with respect to the individual directors' potential for liability for breach of the duty of loyalty.

C. *Analysis*

1. Plaintiff's Breach of Fiduciary Duty and Demand Futility Allegations

As described above, to show demand futility under Delaware law plaintiff must show the individual directors face a substantial likelihood of personal liability. (*Rales, supra,* 634 A.2d at p. 936.) In assessing demand futility, we examine the directors' risk of personal liability based on the complaint's causes of action. (See *Wood*, *supra*, 953 A.2d at p. 143.)

Plaintiff's first cause of action alleges that the current and former officers and directors of AMD breached their fiduciary duties, including their duty of loyalty. The complaint alleges the defendants (including the director defendants) created a culture of "lawlessness within AMD" and "consciously fail[ed] to prevent" the Company from engaging in "unlawful acts." The complaint further alleges the defendants breached their duty of loyalty by "recklessly permitting the executive defendants to make improper statements about Company results and projections." It alleges the director defendants "knew or were reckless in not knowing that: (i) the Llano experienced significant and pervasive supply constraints throughout 2011; (ii) the supply constraints and delay in bringing to market the Llano APU [Accelerated Processing Unit] would negatively affect demand; (iii) the introduction of the Trinity APU would further reduce demand for the Llano APU; and [(iv)] the reduced demand for the Llano APU would result in reductions in gross margin, inventory write-downs, and a failure to achieve the projected financial results."

Regarding three of the Demand Board directors (Barnes, Chow, and Caldwell), the complaint alleges they served on AMD's audit and finance committee during the pertinent time period and breached their duty of loyalty by "approving the statements described herein." The complaint alleges Barnes, Chow, and Caldwell (along with

another defendant not at issue here) had additional duties to AMD, including overseeing "the Company's compliance with legal and regulatory requirements."

Before turning to the other director defendants, we first examine the allegations pertaining to Read, who was both an officer and director. Having independently reviewed the complaint, we conclude that plaintiff sufficiently alleged that Read breached his duty of loyalty and therefore faces substantial exposure to liability in his capacity as both an officer and director. Read was the CEO during much of the pertinent time period involving the problems with Llano. The complaint amply alleges he had intimate knowledge of the ongoing operational issues with Llano and alleges he personally made numerous misstatements in various settings relating to the product. For example, Read made "overly positive statements" to analysts and investors about Llano and expressed confidence in GlobalFoundries' manufacturing, while expressing the opposite in internal e-mails and e-mails with GlobalFoundries, for instance noting that he was " 'not confident in [GF's] ability to . . . deliver to the 4Q GF commitments.' "

We next turn to the remaining six implicated directors, Claflin, Barnes, Eberhart, Chow, Caldwell, and Donofrio. To excuse the ordinary requirement of presuit demand on the board, the complaint must adequately allege that at least five of these six directors face a substantial likelihood of liability based on a breach of the duty of loyalty, such that they could not exercise independent and disinterested business judgment when responding to a presuit demand. (See *McElrath*, *supra*, 224 A.3d at p. 990.)

Plaintiff's demand futility allegations as to these six directors consist of two overall categories of wrongdoing. The first relates to improper and multiple disclosures made by others that the director defendants "repeatedly acquiesced" to or failed to correct, an overall theory of liability we refer to as "conscious inaction." The second category relates to allegedly improper disclosures the director defendants made in AMD's February 24, 2012 Form 10-K (2012 Form 10-K), which was signed by Claflin, Barnes, Eberhart, Chow, Caldwell, and Donofrio.

19

## 2. Substantial Likelihood of Personal Liability Based on Conscious Inaction

Plaintiff does not meaningfully allege any liability based on a general lack of attention by board members to AMD's critical operations. For example, the complaint does not allege that the director defendants failed to make efforts to be adequately informed of operational issues related to Llano. (See *Marchand*, *supra*, 212 A.3d at p. 823.) While the complaint alleges in various places that the defendant directors "failed to ensure that reliable systems of internal controls were in place" at AMD, it does not support this conclusory statement with any facts. To the contrary, the complaint alleges that the board of directors met numerous times during the pertinent time period and received detailed information and updates about Llano. Therefore, the complaint does not support an inference that the director defendants faced substantial liability for a general lack of attention, in the sense of a classic *Caremark* claim.

However, a director can also violate the duty of loyalty by failing to respond appropriately to evidence of illegality. A complaint can adequately establish demand futility by alleging that a board member violated the duty of loyalty and thus faces a substantial likelihood of personal liability where "the board consciously failed to act after learning about evidence of illegality—the proverbial 'red flag.' " (*South v. Baker* (Del. Ch. 2012) 62 A.3d 1, 15 (*South*).)

The complaint states that the director defendants breached their duty of loyalty by "consciously failing" to prevent the Company from engaging in unlawful acts. The complaint alleges the director defendants "repeatedly acquiesced" to the misstatements made by others.

"Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.' " (*Wood*, *supra*, 953 A.2d at p. 143.) Having reviewed the complaint in its entirety, we conclude that plaintiff has failed to allege the necessary particularized facts to support a conclusion that

20

Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio breached their duty of loyalty based on a theory of conscious inaction to a " 'red flag' " sufficient to trigger a substantial likelihood of liability. The complaint contains no information given to the director defendants that Llano itself or the business strategy for Llano was illegal. By contrast, in *Rosenbloom v. Pyott* (9th Cir. 2014) 765 F.3d 1137, 1145, 1153–1154, a case relied upon by plaintiff, the plaintiffs' claim was that the corporation's board caused the company to adopt a business plan that required illegal conduct (in that case, illegal off-label marketing of a drug). The complaint in *Rosenbloom* alleged that the board had received "repeated FDA warnings about illegal promotion" of the drug and that the illegal conduct persisted for over a decade. As defendants correctly point out, no such " 'red flags' " of illegality or misconduct were presented to the board here, even drawing all reasonable inferences in plaintiff's favor.

While plaintiff emphasizes various internal presentations and reports the board received, the excerpts highlighted by plaintiff do not contain any express notice of misconduct or legal violation or suggestions that misstatements were being made by others in the company. Rather, the documents focus on business issues. While the release of Llano may have been a "disaster" as plaintiff alleges, that allegation is insufficient to satisfy a plaintiff's onerous burden to plead demand futility. " 'A stockholder cannot displace the board's authority [over the corporation's claims] simply by describing the calamity and alleging that it occurred on the directors' watch." (*South*, *supra*, 62 A.3d at p. 14.)

We also are not persuaded that the trial court impermissibly drew inferences in defendants' favor. Rather, the record supports the court's conclusion that the board presentations relied upon by plaintiff both informed the board of directors of manufacturing issues with Llano and of efforts to monitor and fix these issues. The trial court did not err in considering the nature of the presentations in the sense that they reflected board efforts to address problems with Llano. (See *City of Birmingham*, *supra*,

21

177 A.3d at p. 57 [holding that board presentations did not "support plaintiffs' central theory that a majority of the board consciously ignored or intentionally violated positive law" given that "the board was not only informed of environmental problems, but also the steps being taken to address them"].)

Regarding the allegations that the defendant directors acquiesced to misstatements made by others, we conclude the allegations are insufficient to allege a basis for excusing the demand requirement. "To plead demand futility, a stockholder plaintiff must plead facts establishing a sufficient connection between the corporate trauma and the board such that at least half of the directors face 'a substantial likelihood of personal liability.' [Citation.] Without a connection to the board, a corporate trauma will not lead to director liability. Without a substantial threat of director liability, a court has no reason to doubt the board's ability to address the corporate trauma and evaluate a related demand." (*South*, *supra*, 62 A.3d at p. 14.) The complaint here fails to plead a sufficient connection to the individual board members to establish demand futility.

For example, plaintiff does not point us to, and the complaint does not reveal, any particular earnings calls or other public statements that contained allegedly false information (other than the 2012 SEC Form 10-K filing, which we address further below) in which Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio participated. Plaintiff claims defendants "approved and permitted" false and misleading statements, pointing in particular to statements made by former-CFO and interim CEO Seifert on a "conference call" on April 4, 2011, where he stated for instance that the yields of Llano were " 'on target' " and the issues related to Llano were " '*behind*' the Company." However, the complaint does not allege particularized facts showing that Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio knew in advance that Seifert or others would be making the particular statements alleged in the complaint, let alone how or when the directors

22

approved Seifert's statements or other various statements made by company managers.[8] The complaint does not allege Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio made statements during, or were participants in, the many conference calls described in the complaint.

"Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1. It is unclear from such allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile." (*Citigroup*, *supra*, 964 A.2d at p. 133, fn. 88.) The broad and conclusory allegations that the directors "approved" or "repeatedly acquiesced" to the various statements made by the company or its officers are insufficient to meet the particularity requirement of alleging bad faith by the individual directors to satisfy the test for demand futility.

Therefore, we decide plaintiff has failed to allege demand futility based on a theory of liability of conscious inaction by members of the Demand Board.

      3.  <u>Substantial Likelihood of Personal Liability Based on Misstatements in the 2012 Form 10-K</u>

We now turn to the complaint's allegations of demand futility based on the defendant directors' signatures on the February 2012 Form 10-K that allegedly contained improper statements related to Llano.

At the outset, we note that the first cause of action for breach of fiduciary duty does not reference the directors' involvement in signing the 2012 Form 10-K as a basis

---

[8] In his reply brief, plaintiff notes that the company's "internal documents" reflect that board members were provided a " 'synopsis' " of an earnings call, but that allegation does not appear in the complaint. Moreover, even assuming that Claflin, Barnes, Eberhart, Chow, Caldwell, and Donofrio received such a synopsis, plaintiff does not allege they approved it or otherwise participated in its creation before the call.

for their personal liability. Nevertheless, in the demand futility allegations of the complaint, which are incorporated by reference into the first cause of action, the complaint alleges defendants Read, Claflin, Barnes, Eberhart, Chow, Caldwell, and Donofrio "each received regular Board updates throughout 2011 explicitly detailing: (i) [GlobalFoundries'] repeated failures to timely deliver wafers; (ii) [GlobalFoundries'] repeated and 'ongoing' struggles on 'all key factory performance metrics;' (iii) Llano 32nm supply constraints affecting all segments of client business; and (iv) AMD's lack of confidence in [GlobalFoundries'] recovery plan. These defendants were also personally informed in early 2012 by their then-fellow Board member, defendant Muhairi, that product demand was waning. Nonetheless, each of these Director Defendants signed the Company's February 24, 2012 Form 10-K, which misrepresented that [GlobalFoundries'] 'difficulties' only occurred in the third quarter of 2011 and utterly failed to disclose that Llano demand decreased commensurate with the eventual Llano supply increases." We will therefore consider the demand futility allegations with respect to the signing of the 2012 Form 10-K.

As defendants correctly point out, the complaint does not specifically allege that the director defendants knew that the statements in the 2012 Form 10-K regarding the timing of the problems with GlobalFoundries and the failure to describe waning demand for Llano were false when the directors signed the filing. Nevertheless, plaintiff contends that the complaint contains particularized facts by which we can draw the reasonable inference that the directors knew the statements were false when they signed the document.

At this stage of the pleadings, we "will accept the truth of all facts which may logically be inferred from the facts alleged in the complaint." (*Branson v. Martin* (1997) 56 Cal.App.4th 300, 302.) However, in the context of allegations of demand futility under Delaware law, "while we must draw all reasonable inferences in the plaintiff's favor, we do not draw unreasonable inferences." (*McElrath*, *supra*, 224 A.3d at p. 990.)

24

The complaint alleges that the defendant directors signed the 2012 Form 10-K and that this document both overstated demand for Llano and mischaracterized when the problems with GlobalFoundries occurred in 2011, despite also acknowledging that problems occurred. The complaint alleges that on February 20, 2012, that is four days before the filing of the 2012 Form 10-K, defendant director Claflin e-mailed Read that defendant director Muhairi had said " 'at [a] recent [B]oard meeting' " that GlobalFoundries " 'had been asked to hold inventory because [AMD] didn't have demand for it.' " (Emphasis and italics omitted.) The complaint also alleges that the director defendants were "personally informed" by Muhairi "in early 2012" that "product demand was waning."

The complaint alleges the 2012 Form 10-K contains several improper statements "overstating" the demand for Llano and mispresenting the timeframe of when yields and performance improved in 2011. According to the complaint, the 2012 Form 10-K stated that "32nm yields and performance improved 'during the second half of 2011,' when in fact, at best, such improvements did not actually begin to occur until the very end of the year." The complaint also contains lengthy block quotations that are excerpts of the Form 10-K.

We conclude that the allegations in the complaint, even if credited, do not show that each of the directors face a substantial likelihood of liability for the breach of the duty of loyalty. On their face, the allegations do not support a reasonable inference the directors acted in bad faith in connection with the 2012 Form 10-K.

In *Citigroup*, the Delaware Chancery Court addressed a similar claim that directors of a financial institution violated their fiduciary duty to properly disclose business risks in the context of failing to properly or fully disclose a financial institution's exposure to subprime assets. (*Citigroup*, *supra*, 964 A.2d at p. 111.) In that case, plaintiffs alleged "that there were extensive 'red flags' that should have given defendants notice of the problems that were brewing in the real estate and credit markets and that

25

defendants ignored these warnings in the pursuit of short term profits and at the expense of the Company's long term viability." (*Id.* at p. 111.) Plaintiffs argued that based on " 'red flags' " the complaint alleged "a reasonable inference that the director defendants, and particularly the [Audit and Risk Management] Committee members, knew that certain disclosures regarding the Company's exposure to subprime assets were misleading." (*Id.* at p. 132.)

The financial institution in *Citigroup* also had an exculpatory provision in its charter similar to that of AMD. In *Citigroup,* the charter "exculpate[d] the director defendants from personal liability for violations of fiduciary duty except for, among other things, breaches of the duty of loyalty and acts or omissions not in good faith or that involve intentional misconduct or knowing violation of law." (*Citigroup*, *supra*, 964 A.2d at p. 132.) Based on this exculpatory provision and acknowledging that shareholders are " 'entitled to honest communication from directors, given with complete candor and in good faith,' " the Delaware court determined that "plaintiffs must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly or intentionally.' " (*Ibid.*)

Applying this standard, the court in *Citigroup* stated it could not reasonably conclude that the directors faced a substantial likelihood of liability for at least three reasons. First, it noted that plaintiffs failed to allege with sufficient specificity the actual misstatements or omissions, as the complaint "does not identify any actual disclosure that was misleading or any statement that was made misleading as a result of an omission of a material fact." (*Citigroup*, *supra*, 964 A.2d at p. 133.) Second, although the complaint alleged the directors "reviewed" the financial statements, plaintiffs did not allege facts "suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions." (*Id*. at p. 134.) Finally, and "perhaps most importantly," the court noted that the complaint failed to make specific factual allegations that would allow for an "inquiry" into the "state of mind of

26

the individual director defendants." (*Ibid.*) The court observed that the alleged " 'red flags' " amounted to "nothing more than indications of worsening economic conditions" (*ibid*.) and therefore did not support a "reasonable inference that the director defendants made or allowed to be made any false statements or material omissions with knowledge or in bad faith." (*Id.* at p. 135.)

Here, too, the complaint lacks particularized facts to infer bad faith by Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio. As in *Citigroup*, the complaint does not contain any particularized allegation that any of the six directors played any role in including the allegedly false statements in the 2012 Form 10-K. The complaint here depicts a dynamic business situation involving a new product made using a novel and complex manufacturing process and production issues stemming from a third-party manufacturer. Moreover, the complaint acknowledges that AMD had "fixed" the supply issues with Llano by the end of 2011 and does not allege that the defendant directors derailed or undermined efforts to fix those issues. Based on these circumstances, we are not persuaded that the directors' knowledge about various operational issues in the context of a fluctuating business situation and subsequent signing of the 2012 Form 10-K are sufficient to support a reasonable inference that the six directors acted in bad faith when they signed the form such that there is a substantial likelihood that they would be personally liable for a breach of the duty of loyalty.

In asserting that the complaint adequately pleads demand futility, plaintiff relies on *Okla. Firefighters Pension & Ret. Sys. v. Corbat* (Del. Ch., Dec. 18, 2017, No. CV 12151-VCG [nonpub. opn.] [WL 6452240]). However, that case highlights the demanding standard required by Delaware law for showing bad faith. " 'Simply alleging that a board incorrectly exercised its business judgment and made a "wrong" decision in response to red flags . . . is insufficient to plead bad faith.' " (*Id.* at p. 16.) For a breach of the duty of loyalty "a board's efforts can be ineffective, its actions obtuse, its results harmful to the corporate weal, without implicating bad faith. Bad faith may be inferred

27

where the directors knew or should have known that illegal conduct was taking place, yet 'took *no steps* in a good faith effort to prevent or remedy that situation.' " (*Id.* at p. 17.)

The Delaware Supreme Court has highlighted that "[p]leading bad faith is a difficult task and requires 'that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.' " (*McElrath*, *supra*, 224 A.3d at pp. 991–992.) " '[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.' It is not enough to allege that the directors should have been better informed—a due care violation exculpated by the corporation's charter provision." (*Id*. at p. 993, fn. omitted.)

We conclude the complaint does not adequately plead bad faith sufficient to excuse the presuit litigation demand requirement. The complaint alleges as a group that the defendant directors face substantial personal liability because they each signed the 2012 Form 10-K and were told in "Board updates throughout 2011" about the manufacturing problems and by a board member "in early 2012" about waning product demand. But the complaint lacks any particularized allegations regarding whether, prior to, or after signing the 2012 Form 10-K, Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio received specific information that would have put them on notice that the statements in the 2012 Form 10-K were false. While the complaint also generally alleges Barnes, Chow, and Caldwell served on AMD's audit and finance committee during the pertinent time period, it does not allege any additional and nonconclusory facts about those three directors in the context of the 2012 Form 10-K that would expose them to substantial personal liability. It is "well-settled" under Delaware law that "membership on the Audit Committee" is an insufficient basis to infer the requisite scienter of a director. (*Wood*, *supra*, 953 A.2d at p. 142.)

In our view, the strongest reasonable inference that can be drawn in plaintiff's favor from the allegations in the complaint is that each of these six directors was negligent in their failure to modify the language in the 2012 Form 10-K to more

28

accurately reflect the issues with Llano.  However, the complaint's allegations cannot reasonably be read to show that Claflin, Barnes, Eberhart, Chow, Caldwell, or Donofrio acted in bad faith under the standards set out in Delaware law.  (See *McElrath*, *supra*, 224 A.3d at p. 994.)

In support of his contention that he adequately pleaded demand futility, plaintiff also relies upon *In re infoUSA, Inc. Shareholders Litigation* (Del. Ch. 2007) 953 A.2d 963.  That case is distinguishable because the allegations here fall far short of the "egregious" misstatement at issue in that case.  (*Id*. at p. 990.)  In *infoUSA*, the Delaware Chancery Court found plaintiffs sufficiently alleged demand futility based on misleading public statements made in the corporation's Form 10-Ks where the complaint alleged particularized evidence that certain board members had received directly conflicting information prior to signing the Form 10-Ks.  (*Id.* at pp. 990–991.)  In particular, the 10–Ks "affirmatively stated" that payments made by the company "involved 'usage of aircraft and related services' " whereas the company's internal report, disseminated to the board members shortly prior to their signing one of the Form 10-Ks, indicated that "almost $600,000 worth of the payments constituted compensation for the use of personal residences, the American Princess yacht, travel services or payments to contractors" for the personal benefit of the company's CEO.  (*Id.* at p. 990.)  The court concluded that "[n]o conceivable definition of candor will shoehorn such payments into services 'related' to the use of aircraft."  (*Id.* at pp. 990–991.)

By contrast, the statements made in the Form 10-K here, even assuming all inferences in plaintiff's favor, do not resemble the patently false representations at issue in *infoUSA*.  Plaintiff has not identified, and our independent research has not located, any cases applying Delaware law where a similar type of misstatement (that is, mischaracterizing timing of supply issues and failure to describe softening demand) was deemed sufficiently egregious to support a conclusion that the individual director who signed the filing faced a substantial likelihood of a breach of the duty of loyalty.  For

29

these reasons, we decide plaintiff has not sufficiently pleaded demand futility as to at least six directors[9] with respect to his breach of fiduciary duty claim.

Plaintiff's remaining two causes of action, the claims for waste of corporate assets (second cause of action) and unjust enrichment (third cause of action) are premised on the breach of fiduciary duty alleged in his first cause of action. Because plaintiff has failed to plead that a majority of AMD's directors on the Demand Board face a substantial likelihood of liability for breach of fiduciary duty, he has also failed to plead that a majority of directors face a substantial likelihood of liability for waste and unjust enrichment.

As plaintiff has withdrawn his claim that he has a basis to seek leave to amend the complaint, we affirm the trial court's order sustaining defendants' demurrer without leave to amend.[10]

D. *Plaintiff's Surreply*

Plaintiff asserts the trial court abused its discretion by failing to grant him leave to file a surreply brief. As described above, in connection with their demurrer defendants submitted a reply brief that plaintiff contends raised two new arguments that plaintiff did not have an opportunity to address. Plaintiff requested leave to file a surreply and submitted a two-page proposed surreply. The trial court did not address plaintiff's request to file a surreply, and it was not raised by the trial court or any of the parties at the July 2018 hearing on defendants' demurrer.

---

[9] Plaintiff alleges in his complaint that nondefendant directors Edelman and Yahia lack independence and are also incapable of impartially considering a demand. We need not reach this issue because, even assuming such allegations fulfill the requirements of Rule 23.1, there would only be three directors on the Demand Board who are disabled from considering a demand (that is, Read, Edelman, and Yahia). Nine directors remain on the Demand Board who are capable of considering a demand impartially, and therefore plaintiff cannot establish demand futility.

[10] In light of on our conclusion that plaintiff failed to sufficiently plead demand futility for each of his three causes of action, we do not reach plaintiff's arguments that his causes of action otherwise state a claim.

Even assuming for the sake of argument that plaintiff could establish that the trial court abused its discretion in denying him leave to file a surreply, he cannot establish prejudice.  Plaintiff had ample opportunity to address any new arguments at the hearing on defendants' demurrer.  Further, the new arguments identified by plaintiff in the surreply related to defendants' contention that the relevant board of directors was not the 2014 Demand Board, an argument the trial court ultimately rejected when it ruled in favor of plaintiff on this question.  Because plaintiff has not demonstrated he was prejudiced by the trial court's failure to grant him leave to file a surreply brief, he has not met his burden of showing reversible error on this claim.  (See *Guimei v. General Electric Co.* (2009) 172 Cal.App.4th 689, 704.)

## III.  DISPOSITION

Treating the order sustaining the demurrer as a judgment of dismissal, we affirm. Respondents are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

_____
Danner, J.

WE CONCUR:

_____
Premo, Acting P.J.

_____
Bamattre-Manoukian, J.

**H046255**
*Wessels v. Read et al.*